# TEXAS CIVIL APPEALS REPORTS.

## THIRD DISTRICT, 1901.

### W. W. TERRY v. J. E. DALE ET AL.

Decided October 30—December 4, 1901.

**1.—School Land—Purchase of Additional Sections.**

See this case as to whether a settler upon school land classed as dry graz-ing land can purchase additional sections of pasture land under chapter 47, Laws of 1895.

**2.—Same—Absolute Lease Line—Repeal.**

The Act of 1895 permitting purchase of land leased by the State to others was repealed as to lands lying within the absolute lease district created by the Act of 1897; an applicant who had not acquired his right to purchase before the latter law took effect could not thereafter buy such leased lands.

**3.—Same—Right to Home Section—Cash Payment—Draft.**

The execution and delivery by a purchaser of school land of the obligations required by the Act of 1895 did not vest title without making the cash pay-ment required by that law; and inclosing a draft for that amount through the mail to the State Treasurer was not such payment nor did not give a right as a purchaser until same was accepted by the Treasurer.

**4.—Same—Acceptance After Repeal.**

Inclosing a draft for his first payment, to the Treasurer, on the last day before the repeal of the law, did not become such payment as fixed the appli-cant's rights as a purchaser by the Treasurer receiving and cashing the draft after the law giving the right to purchase was repealed.

Appeal from Tom Green. Tried below before Hon. J. W. Timmins.

Terry sued J. E. and J. B. Dale in trespass to try title, and appealed from a judgment for defendants.

*B. W. Rimes* and *Joseph Spence, Jr.,* for appellant.

[In their motion for rehearing counsel for appellant urged the follow-ing, among other reasons for reconsidering the judgment of affirmance.]:

The court erred in that part of its opinion and judgment in holding as matter of fact, under the facts found, that appellant could not, under the land law of 1895, purchase the lands sued for as "additional lands" to his home section, said home section not having been classified and purchased

as agricultural land. Because by section 18 of chapter 47, Law of 1895, it is provided as follows: Any actual settler upon "any of the lands mentioned in this act, being the head of a family, shall have the right to buy at any time not more than three additional sections of strictly pasture lands, notwithstanding any lease thereof, unless by some other actual settler, the head of a family, having not more than three sections." Sec. 18, p. 69 and 70, chap. 47, Gen. Laws 1895.

The foregoing from said section 18 is a separate and independent enactment from section 8 of said act, cited by the court in its opinion, and secured to appellant the right to purchase the lands sued for as "additional lands," under the facts found in the record, notwithstanding appellant's home section was not classed as "agricultural land."

Section 18 is the law applicable to appellant's case, and not section 8 cited in the opinion of the court.

*J. W. Hill,* for appellees.

FISHER, Chief Justice.—This is a suit in trespass to try title, filed September 29, 1899, brought by appellant as plaintiff in the court below against appellees as defendants, in which plaintiff sought to recover the title and possession of certain State school and asylum lands situate in Tom Green County, and of value of the rents for same.

Plaintiff's second amended petition, on which trial was had, was filed December 22, 1900. Trial before the court without a jury on December 22, 1900, resulted in a judgment in favor of defendants.

Plaintiff excepted, gave notice of appeal, filed appeal bond January 10, 1901, and assignments of error February 2, 1901, and the case is now before this court for revision and correction of the errors complained of in the assignments.

The lands involved are as follows: 1. School section No. 2, B. S. & F., 640 acres, made by virtue of certificate 1392. 2. Section No. 5, blind asylum, 640 acres; section No. 6, blind asylum, 640 acres; and were claimed by plaintiff under his application to purchase the same as "additional lands" to his home section, under the Act of April 16, 1895, he being the head of a family and an actual settler in good faith, and a bona fide resident upon section No. 3, blind asylum, 640 acres in Tom Green County, which had been awarded to him by the Land Commissioner prior to date of his application to purchase said additional lands.

The court filed conclusions of fact and law, and held as matter of law from the facts found that "as plaintiff had acquired no right in the land sued for on August 20, 1897 (the date plaintiff's applications to purchase said additional lands were filed in the land office) and said lands were then under lease, said lease on that date became absolute; and as defendants succeeded to the rights under said lease, plaintiff has no title to said land and ought not to recover."

Plaintiff's assignments of errors are as follows:

1.  The court erred in its conclusion of law in holding that plaintiff had acquired no rights to the lands sued for on August 20, 1897.

2.  The court erred in its conclusion of law in holding that the lease contracts under which defendants claimed became absolute on August 20, 1897, so that plaintiff could acquire no rights to said lands under his application to purchase the same.

3.  The court erred in rendering judgment in favor of defendants under the facts found, and in holding as matter of law that plaintiff is not entitled to recover.

The conclusions of fact and law found by the trial court, which findings include all the facts proven in the case, are as follows:

*Conclusions of Fact.*—1.  On the 20th day of January, 1897, plaintiff was and is now the head of a family, and on said date was and ever since has been and is now an actual settler in good faith and bona fide resident wih his family upon section No. 3 for 640 acres of land situate in Tom Green County, surveyed for the blind asylum.

2.  That prior to said 20th day of January, 1897, said survey No. 3 had been surveyed and set apart for the blind asylum fund, and had been, prior to said 20th day of January, 1897, classified by the Commissioner of the General Land Office as dry grazing land, appraised at $1 per acre, and placed on the market for sale in the manner required by law.

3.  The plaintiff on said 20th day of January, 1897, made his application to purchase said section No. 3 as an actual settler thereon, in accordance with the act of the Legislature approved April 16, 1895, providing for the sale of State school and asylum lands; made his first payment of principal to the State, and executed his obligation to the State for balance of the purchase money, and in all things complied with the law in making said purchase.

4.  Plaintiff's said application and obligation were received and filed in the Land Office on January 22, 1897, his first payment of principal paid into the State treasury, and said land awarded to him by the Land Commissioner on May 28, 1897, said sale to date from January 22, 1897, and all interest has been paid on said purchase, as required by law and the terms of his contract of sale to this date, and plaintiff's said purchase is now in good standing.

5.  That plaintiff has continually resided on said section No. 3 with his family, as their home, ever since his said purchase on January 20 and 22, 1897, and now resides there as their home.

6.  That prior to the 17th day of August, 1897, section No. 2, for 640 acres, in the name of Beaty, Seale & Forwood, made by virtue of certificate No. 1392, situate in Tom Green County, Texas, had been surveyed and set apart for the common school fund, classified by Commissioner of General Land Office as dry grazing land, appraised at $1

per acre, and placed on the market for sale or lease under the act of April 16, 1895, in the manner required by law.

7. That prior to August 17, 1897, sections Nos. 5 and 6 for 640 acres each, situate in Tom Green County, Texas, had been surveyed and set apart for the blind asylum fund, classified by the Land Commissioner as dry grazing lands, appraised at $1 per acre and placed on the market for sale or lease under the Act of April 16, 1895, in the manner required by law.

8. That on said 17th day of August, 1897, plaintiff made his three separate applications to the Land Commissioner to purchase said section No. 2, B. S. & F., 640 acres, and said section No. 5, blind asylum, 640 acres, and said section No. 6, blind asylum, 640 acres, respectively; but in his application for said survey No. 6 he described the land applied for as "survey No. 6, orphan asylum," and not as "No. 6, blind asylum." All said applications with the obligations for the balance of the purchase money duly executed by plaintiff were dated August 17, 1897, at San Angelo, Texas, and received and filed in the General Land Office on August 19, 1897.

9. Each of said applications is on a printed form, headed thus: "Application and affidavit to purchase grazing land under lease as an actual settler on and owner of not more than one section purchased from the State." And attached to each of said applications is the following affidavit of plaintiff: "For the purpose of securing said land and of complying with the law regulating the sale of the same, I hereby make and subscribe the following oath, to wit: 'I, W. W. Terry, do solemnly swear that my house is upon section No. 3, certificate ———, issued to blind asylum in Tom Green County, purchased under the Act of 1895, and that I am a bona fide settler on the same and head of a family, and am now, neither as assignee or original purchaser, the owner of any other land purchased from the land. I further swear that I am not acting in collusion with others for the purpose of buying the land for any other person or corporation, and that no other person or corporation is interested in this purchase save myself. That my postoffice address is San Angelo, in Tom Green County, Texas. (Signed) W. W. Terry, Applicant.' Subscribed and sworn to before me, this the 17th day of August, 1897. W. A. Threadgill, Notary Public in and for Tom Green County, Texas."

10. On August 20, 1897, plaintiff mailed at San Angelo a letter addressed to the State Treasurer at Austin, in which was inclosed a bank draft payable to the Treasurer for the sum of $48 to pay the first installments of the purchase money for said three sections of land last above described, which letter and draft were received by said State Treasurer at Austin on the 23d day of August, 1897, which draft was collected and the said amount of money paid into the State treasury, but subsequently refunded to plaintiff, as hereinafter stated.

11. That on the 23d day of August, 1897, upon consideration and

examination by the Land Commissioner of the said plaintiff's said application to purchase, the same was rejected by said Land Commissioner and said lands were not awarded to plaintiff for the reasons as indorsed on each of said applications by the Land Commissioner, as follows, to wit: "Section 3, on which you live, is classed as dry grazing land." Refused. "Wrote 8:23:'97." "B."

12. Thereupon, on October 9, 1897, the State Treasurer having previously been notified by the Land Commissioner of his action in rejecting plaintiff's application to purchase said lands as stated in the eleventh finding above, refunded to plaintiff the $48 deposited in the treasury on August 23, 1897, as first payment on said lands as stated in finding number 10, above.

13. Plaintiff has never acquiesced in said rejection by the Land Commissioner of his application to purchase said lands, nor abandoned his attempted purchase of the same; but ever since the date of his said application has been ready and willing and able to pay to the State Treasurer all the annual installments of interest on said lands as required by law, and his said applications and obligations, but the State Treasurer would not have received or accepted the same had payment been tendered, because of the rejction by the Land Commissioner of plaintiff's applications to purchase, as above found.

Prior to January 1, 1897, the lands involved in this suit were classified by the Commissioner of the Land Office under the Act of 1895 as dry grazing lands and appraised at $1 per acre, and the same were, prior to said January 1, 1897, placed upon market by the Commissioner of the General Land Office, open to sale or lease.

14. On January 2, 1897, the Commissioner of the General Land Office leased said three sections of land involved in this suit to John P. Lee and Philip C. Lee for a term of five years from January 22, 1897, under the act of the Twenty-fourth Legislature, chapter 47, as amended by act approved April 16, 1895, which lease contract was duly recorded in Tom Green County on April 19, 1897, and which lease was, by written transfer duly executed, assigned by said John P. and Philip C. Lee to defendant, J. B. Dale, on November 1, 1897.

15. All rents were paid on said lands by defendants under said lease contract up to January 22, 1899.

16. On the 22d day of January, 1899, the Commissioner of the General Land Office leased said lands to defendants under the law then in force for the term of ten years from the 22d day of January, 1899, said lease contracts recorded in Tom Green County on April 12, 1899, and all rents under said lease contracts have been paid to this date.

17. On October 31, 1895, S. W. Wells made his application to purchase as an actual settler under the act of the Legislature approved April 16, 1895, the northeast one-quarter of section No. 2, block 4, surveyed for the school fund by virue of certificate No. 384495, issued to the Houston & Texas Central Railway Company in Tom Green County, Texas, which had theretofore been legally classified as dry grazing land,

appraised at $1 per acre and placed on the market for sale by the Land Commissioner. Said quarter section was awarded to said Wells under his said application to purchase; first payment of purchase money and all interest required by law and terms of his application and obligation was paid and the law complied with by him in making said purchase.

18. On the 27th day of March, 1897, said S. W. Wells and his wife conveyed said northeast one-quarter of section No. 2, Houston & Texas Central Railway Company, to A. J. Taylor, who duly filed his application and obligation to purchase the same in the General Land Office on May 10, 1897, as an actual settler under said Act of April 16, 1895, which application and obligation were received by and accepted by the Land Commissioner in lieu of the application and obligation of said Wells and said land awarded to said Taylor, May 10, 1897.

19. Said S. W. Wells, from date of his purchase of said northeast one-quarter of section No. 2 continuously resided upon the same as his home up to the date of his sale to said A. J. Taylor as above stated, and said A. J. Taylor continuously resided on said land as his home from date of his purchase to the date of his sale to defendant J. B. Dale, as hereinafter found. Said land was continuously occupied by said Wells and Taylor for over three consecutive years from the date of the original purchase by said Taylor, as required by law and the terms of their applications to purchase, above set out, and proof of such occupancy was made and filed in the Land Office November 14, 1898, as required by law.

20. On the 19th day of October, 1899, A. J. Taylor and his wife conveyed said northeast one-quarter section 2, Houston & Texas Central Railway Company, to defendant J. B. Dale, who on October 19, 1899, made his application to purchase the same from the State, as assignee of A. J. Taylor, filed his said application and obligation in the Land Office on October 21, 1899, which was accepted by the Land Commissioner in lieu of the application and obligation of said A. J. Taylor, and said land awarded to said J. B. Dale on the —— day of ———, 1899, and on the —— day of ———, 1900, said J. B. Dale paid into the State treasury all purchase money and interest on the same, and patent was issued to said J. B. Dale for said land on the 26th day of February, 1900.

21. Said J. B. Dale has never resided upon or occupied said northeast one-quarter of section No. 2, Houston & Texas Central Railway Company or any part thereof.

22. On October 19, 1899, defendant J. B. Dale made his application to the Land Commissioner to purchase as additional land to said northeast one-quarter of section No. 2, Houston & Texas Central Railway Company, under Act of April 16, 1895, and the amendment of May 19, 1897, the whole of section No. 2, B. S. & F. certificate 1392, 640 acres (one of the tracts involved in this suit) attached to which application is the affidavit of said J. B. Dale, as follows: "For the purpose of securing said land and of complying with the law regulating the sale

of the same, I hereby make and subscribe the following oath, to wit: 'I, J. B. Dale, do solemnly swear that I own northeast one-quarter of school section No. 2, block 4, certificate 38-4495, granted to Houston & Texas Central Railway Company, in Tom Green County, upon which proof of occupancy has been made and filed in Land Office, and am not now, either as assignee or original purchaser, the owner of any other land purchased from the State. I further swear that I am not acting in collusion with others for the purpose of buying this land for any other person or corporation, and no other person or corporation is interested in this purchase save myself. That my postoffice address is Bonham, in Fannin County, Texas. (Signed) J. B. Dale.' Subscribed and sworn to before me, this 19th day of October, 1899. A. W. Armstrong, Notary Public in Tom Green County, Texas."

23. Said application and affidavit, with said J. B. Dale's obligation for balance of purchase money, were filed in Land Office on October 21, 1899, payment made into the State treasury of the cash payment required by law, and said land was awarded to said J. B. Dale on the —— day of October, 1899.

24. On January 19, 1900, said J. B. Dale paid into the State treasury all purchase money on said section No. 2, principal and interest, and on the 26th day of February, 1900, patent was issued to said J. B. Dale for said land.

25. By the lease made by the State to John P. and Phil. C. Lee, January 22, 1897, twelve sections of land were leased to them, and on the 10th day of August, 1897, the Commissioner of the Land Office leased to J. M. Franklin two sections of the lands leased to said Lees on January 22, 1897, and on August 17, 1897, defendants had only ten sections of said land leased from the State, which was all the land in their leasehold at plaintiff's application to lease.

26. The rental value of said lands described in plaintiff's petition from August 20, 1897, to date of this trial is 3 cents per acre per annum.

*Conclusions of Law.*—As plaintiff had acquired no rights in the land sued for on August 20, 1897, and as said land was then under lease, said lease on that date became absolute, and as defendants succeeded to the rights under said lease plaintiff has no title to said land and ought not to recover.

In our opinion, the judgment of the trial court can be sustained upon two grounds. Section 8 of the Act of 1895 authorized a bona fide settler, head of a family, who had purchased a section of agricultural land to purchase three additional pastoral sections upon making the oath required by the statute, and it is by virtue of this statute that the appellant, plaintiff below, asserts title to the land in controversy. The facts as found show that the home section purchased and occupied by the appellant was not purchased as agricultural land, and that was the reason assigned by the Commissioner of the Land Office in refusing to award

to appellant the lands in controversy, which are classified as pastoral sections.

The remaining reason why the appellant acquired no interest in the land is that the law under which he attempted to purchase was repealed before he acquired any right or title to the lands. It appears that prior to 1895 and afterwards, and at the time at which the plaintiff sought to purchase the land, the sections in controversy were leased under contract between the lessee and the State, and such were their condition when the Act of 1897 took effect on the 20th day of August of that year. The land in controversy at that time and now lies in what is known as the absolute lease district in Tom Green County, west of the line designated in the Act of 1897, which provides that it shall not be sold during the term of the lease, until otherwise provided by law. The effect of the Act of 1897 was to repeal the Act of 1895, the law then existing under which the appellant attempted to acquire the lands in controversy; and it is clear that unless he had taken steps sufficient to establish some right in the lands on the 20th day of August, 1897, when the law went into effect withdrawing them from sale, he acquired no title thereto.

Section 9 of the Act of 1895 required of the purchaser, in order to acquire an interest in the land, that he shall transmit to the Treasurer of the State one-fortieth of the aggregate purchase money, and send to the Commissioner his obligation of purchase duly executed; and the law provided that upon receipt of one-fortieth of the purchase money by the Treasurer and the affidavit and obligation aforesaid by the Commissioner, the sale shall be deemed and held effective from the date the affidavit and obligation are filed in the General Land Office. These steps, as required by statute, had not been taken by the appellant at the time when the law was repealed under which he purchased. Bryan v. Harvey, 11 Texas, 312; Campbell v. Blanchard, 2 Posey U. C., 321; State of Texas v. Work, 63 Texas, 149.

We find no error in the record and the judgment is affirmed.

                                                        · *Affirmed.*

### OPINION ON REHEARING.

FISHER, CHIEF JUSTICE.—In the original opinion, two reasons were given for affirming the judgment of the trial court. If we were mistaken in the first, it is clear that we were correct in the second. It is clear under the section of the law cited in the original opinion that it was incumbent upon appellant, as the purchaser of the school land, to make the payment required by the law to the State Treasurer in order to acquire an interest in or title to the land. The bare execution and delivery of the obligations required by the statute, would not be sufficient to vest in the purchaser the title. The first payment is made one of the conditions to the vesting of title, and before that was done, a purchaser

would not have such a right, either legal or equitable, in the land as would authorize him to maintain an action to recover.

It appears from the findings of the trial court that the appellant, on the 20th day of August, 1897, mailed at San Angelo, a letter addressed to the State Treasurer at Austin, in which he inclosed a draft sufficient in amount to cover the first installments, of purchase money due for the lands in controversy, which draft was received by the treasurer on the 23d day of August, and was collected by the Treasurer, but the amount thereof was subsequently refunded to the plaintiff.

The law of 1895, under which the appellant attempted to purchase the land was repealed by the law of 1897, which took effect on the 20th day of August of that year. A right sought to be acquired based upon a statute will be lost by its repeal, if the steps required in order to vest the right have not been taken before that time. Where the law requires that certain steps must be taken or incidents of title exist in order to vest a right, a partial compliance with its terms less than a performance of all the conditions demanded will simply create an inchoate right, which a repeal of the law without a saving clause, will destroy. Suth. Stat. Const., secs. 163, 164; 23 Am. and Eng. Enc. of Law, 1 ed., 502. This rule has been applied to a mechanic's lien given by statute, where the requisite proceedings to fix the lien have not been complied with at the date of the repeal (Bailey v. Mason, 4 Minnesota, 546), and to a variety of instances which are indicated in the cases mentioned in the works cited. In the case of Andrea v. Levy, 57 Mississippi, 58, it is correctly said that the repeal of a statute, except as to rights which have vested under it, as completely expunges it from the statute books as if it had never existed.

Therefore, unless it should be held, as claimed by appellant, that mailing the draft at San Angelo to the State Treasurer constituted in law a payment, it is clear that the appellant's rights at the date of the repeal were simply in an inchoate stage, which was destroyed by the repeal. The general rule of law is to the effect that payment must be in money; and, in the absence of an express or an implied obligation to accept something else, the general rule will govern. 18 Am. and Eng. Enc. of Law, 1 ed., 163, 167. It is held in House v. Kountz, 17 Texas Civil Appeals, 403, that a draft drawn upon funds on deposit in a bank when not accepted is simply an obligation binding the drawer, and is not an assignment of that amount of funds in the bank so as to operate as a transfer of the same to the drawee or give him a right of action against the bank.

There existed no contractual relation, either express or implied, between the Treasurer of the State and the appellant, that would authorize the latter to assume that the former would accept a draft as payment of the amount due. In fact, the appellant must have known that the policy of the law was that amounts due the State should be paid in money, and that there was no obligation resting upon the Treasurer to receive anything else. Therefore, if it could be held that a deposit in

the postoffice of a letter addressed to the Treasurer was beyond the power of recall by the appellant, and that it was an act in the steps taken towards payment, it could not be given such effect in this case, because the draft forwarded could not be considered as payment before it was accepted as such, which was not done until after the repeal of the law. The appellant must have known that at the time he deposited the letter containing the draft in the postoffice to be forwarded by due course of mail to the State Treasurer, that that officer was not bound to accept and receive it as payment, and that the law would not, in the absence of such fact, recognize it as such. Hence it follows that when the Treasurer received the draft and collected it, it was simply an act of grace upon his part, and not by reason of any obligation or duty resting upon him. Whatever right, if any, the appellant may have acquired must arise at the time of the collection of the draft by the Treasurer, and the doctrine of relation would not aid him by reaching back and giving validity to the deposit in the postoffice as an act of payment, because the matter deposited and to be forwarded by mail did not possess the quality of money.

*Motion overruled.*

Writ of error refused.